MA-TRAN CORPORATION, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1074–76—1077–76.     Filed May 4, 1978.

*Perry Shields*, for the petitioners.
*John B. Harper*, for the respondent.

STERRETT, *Judge:* Respondent, on November 11, 1975, issued statutory notices in which he determined deficiencies in, and additions to, the respective petitioners' Federal income taxes as follows:

| Petitioner | Year | Deficiency | Additions to tax sec. 6653(a) |
|---|---|---|---|
| Ma-Tran Corp. .............. | FYE 6/30/72 | $12,160.27 | $608.01 |
|  | FYE 6/30/73 | 14,635.67 | 731.78 |
| Andy B. House .................... | 1971 | 308.10 |  |
|  | 1972 | 1,010.08 |  |
|  | 1973 | 754.68 |  |
| Walter D. Huffaker .............. | 1971 | 1,037.40 |  |
| Walter D. and Lois Simpson Huffaker ......... | 1972 | 3,728.80 |  |
|  | 1973 | 4,152.81 |  |

Due to concessions made by the parties the following issues remain for our determination: (1) Whether the Ma-Tran Corp. profit-sharing trust was a qualified trust under section 401(a), I.R.C. 1954, during its fiscal years 1972 and 1973; (2) if so, whether Ma-Tran Corp.'s contributions to the trust were deductible in its fiscal years 1972 and 1973 or in 1973 and 1974; (3) whether Ma-Tran Corp. is entitled to deductions for rental payments on an apartment; (4) whether Ma-Tran Corp. is

---

[1]The following cases are consolidated herein: Andy B. House, docket No. 1075–76, Walter D. Huffaker, docket No. 1076–76; Walter D. and Lois Simpson Huffaker, docket No. 1077–76.

entitled to a deduction for the cost of meals consumed locally by its officer-shareholders Walter D. Huffaker and Andy B. house; (5) whether Ma-Tran Corp. is entitled to deduct travel expenses in excess of the expenses for which Huffaker submitted vouchers; (6) whether Huffaker received dividends in the form of meals and travel expenses; (7) whether House received dividends in the form of meals and rents; (8) whether Ma-Tran Corp. is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Ma-Tran Corp. (hereinafter Ma-Tran) is a Tennessee corporation having its principal place of business in Knoxville, Tenn., on the date the petition was filed. Ma-Tran manufactures, sells, and services heavy construction equipment used primarily in road construction and related asphalt and cement industries. For its taxable years ended June 30, 1972 and 1973, Ma-Tran filed its corporate income tax returns at the Internal Revenue Service Center, Memphis, Tenn. Ma-Tran calculates its income on an accrual basis.

Petitioner Andy B. House (hereinafter House) resided in Knoxville on the date the petition herein was filed. For his taxable years 1971, 1972, and 1973 House filed his individual Federal income tax returns at the Internal Revenue Service Center, Memphis.

Petitioners Walter D. and Lois Simpson Huffaker, husband and wife, resided in Knoxville on the date the petition herein was filed. For his taxable year 1971 petitioner Walter D. Huffaker (hereinafter Huffaker) filed his individual Federal income tax return at the Internal Revenue Service Center, Memphis. For their taxable years 1972 and 1973 petitioners Huffaker and Lois Simpson Huffaker filed joint Federal income tax returns at the Internal Revenue Service Center, Memphis.

During the years in question Huffaker and House were the president and vice president, respectively, of Ma-Tran. Additionally, they were both on Ma-Tran's board of directors along with Carrie Lou Huffaker. Of the 285 shares of Ma-Tran stock which

were outstanding during these years, 214 were owned by Huffaker, 17 by House, and 54 by five other individuals.

On June 30, 1971, the directors of Ma-Tran adopted a profit-sharing plan effective that day. Before issuing a favorable determination letter the Internal Revenue Service required an amendment to the plan which increased the vesting provision in the plan and corrected the formula used to allocate forfeitures. This amendment was adopted by the board of directors on May 15, 1972. A favorable determination letter was issued to the trustees of the profit-sharing plan on July 31, 1972. The trustees were Huffaker and House.

For its fiscal years 1971, 1972, and 1973 Ma-Tran contributed $18,383.44, $18,429.66, and $18,994.73, respectively, to the profit-sharing trust. Ma-Tran made its contributions to the profit-sharing trust for fiscal years 1972 and 1973 on September 15, 1972, and September 15, 1973, respectively. The fiscal 1972 and 1973 contributions were not announced to eligible employees prior to the close of Ma-Tran's fiscal years. No contributions have been made since fiscal year 1974.

On February 7, 1972, the profit-sharing trust made an unsecured loan of $2,000 at 10-percent interest to Steve Dillon (hereinafter Dillon), a Ma-Tran employee covered by the profit-sharing plan. At this time the balance in Dillon's profit-sharing account was $779.64. His vested interest was $77.96. Dillon repaid $350 of the loan. Shortly after the loan was made Dillon terminated his employment at Ma-Tran. At the time of termination Ma-Tran owed Dillon $1,398.86 in commissions. This amount was withheld in repayment of the loan. However, the $1,398.86 was not and has not been restored to the pension trust. The $251.14 balance has not been repaid to the profit-sharing trust or collected by the corporation. The profit-sharing trust has not attempted to obtain a judgment against Dillon for the unpaid balance on the note.

On May 8, 1972, the profit-sharing trust made an unsecured loan of $5,000 to Huffaker. At this time the balance in Huffaker's profit-sharing account was $4,945.05. His vested interest was $494.51. The note, with the interest which had accrued thereon, was renewed on May 8, 1973. At this time he had a balance of $10,367.80 and a vested interest of $2,073.56. The renewal was also, erroneously, signed by House. The renewal, due May 8, 1974, has never been repaid.

In fiscal 1973 the profit-sharing trust made the following unsecured loans at 6-percent interest to Ma-Tran:

| Date | Amount | Due |
|------|--------|-----|
| 9/8/72 | $5,000.00 | 9/8/73 |
| 9/15/72 | 18,379.66 | 9/15/73 |
| 12/22/72 | 10,000.00 | 12/22/73 |
| 2/16/73 | 7,000.00 | 2/16/73 |

Ma-Tran made a repayment of $10,552.62 on its loans on September 26, 1972. However, no other payments have been made and no interest has been paid on these loans. The profit-sharing trust had no gross income for its taxable years ended June 30, 1972 and 1973.

In fiscal year 1972 Ma-Tran had 18 employees, 9 of whom were eligible to participate in the profit-sharing plan. In fiscal year 1973 Ma-Tran had 20 employees with 15 being eligible participants.

On August 13, 1971, Hugh Thorpe, an employee of Ma-Tran and a participant in the profit-sharing plan, died. He was survived by a wife and children by a previous marriage. Under the terms of the plan, unless the participant otherwise designates, the surviving spouse is sole beneficiary. The balance in his profit-sharing account at the time of his death was $1,470.46. The profit-sharing trust made no allocation of funds to the decedent's account for the fiscal year ended June 30, 1972. It has made no distribution of Thorpe's interest.

During fiscal year 1972 the interests of four participants in the profit-sharing plan were terminated due to the termination of their employment at Ma-Tran. By the terms of the plan all had vested interests of at least 10 percent. The total funds in their accounts at the time of termination were as follows:

| Participant | Account balance |
|-------------|-----------------|
| Anderson | $986.02 |
| Colvin | 743.25 |
| Dillon | 779.64 |
| Oster | 759.38 |
| | 3,268.29 |

No funds were distributed. The amount treated as a forfeiture as a result of these terminations was $3,268.29. This amount was

allocated to other participants according to ratios based on their account balances.

During fiscal year 1973 the interests of three participants in the profit-sharing plan were terminated due to termination of their employment at Ma-Tran. Their vested interests and the total funds in their respective accounts at the time of termination were as follows:

| Participant | Vested interest | Account balance |
|---|---|---|
| Rogers | $363.86 | $1,819.30 |
| Maples | 536.79 | 2,683.96 |
| Satterfield | 177.28 | 1,772.82 |
| | 1,077.93 | 6,276.08 |

The total amount in each account was treated as a forfeiture and was allocated to other participants according to ratios based on their account balances.

On January 9, 1975, respondent revoked his prior determination with respect to the qualified status of the Ma-Tran Corp. profit-sharing trust. Respondent based his revocation on his finding that the unsecured loans made to plan participants, to the corporation, and to the trustees were disqualifying transactions; and that the plan provisions dealing with vesting, employer contributions, and forfeitures were not followed.

During the fiscal year ended June 30, 1972, Ma-Tran deducted $2,295 on its income tax returns as rent on a two bedroom apartment located in Knoxville. A similar deduction of $2,080 was taken for its fiscal year 1973. Ma-Tran had paid the rent for the years 1971 through 1973. The lease was originally for 1 year, listed in House's name. It was not renewed.

House lived in the apartment until April 1971 when he began living on a houseboat in the Knoxville area. He stored his out-of-season clothes in one of the apartment's closets while living on the houseboat. He returned to the apartment in the latter part of November 1973. During the interim the apartment was occasionally used by persons doing business with Ma-Tran. The apartment was furnished with House's furniture.

During fiscal 1972 and 1973 Ma-Tran paid meals and entertainment expenses of its officers and directors. Respondent determined that the following amounts paid by Ma-Tran were nondeductible:

|  | *Fiscal 1972* | |
|---|---|---|
| *Officer/director* | *Meals* | *Entertainment* |
| Huffaker ..................... | $1,669.70 | $279.75 |
| House .......................... | 702.40 | 43.30 |
|  | 2,372.10 | 323.05 |

|  | *Fiscal 1973* | |
|---|---|---|
| Huffaker.......................... | 0 | 0 |
| House ........................... | 903.41 | 0 |
|  | 903.41 | 0 |

These meal expenses were incurred in the Knoxville area.

In addition, Ma-Tran advanced $13,700 and $25,950 to Huffaker for travel and entertainment expenses in fiscal years 1972 and 1973, respectively. Huffaker was required to make an accounting to Ma-Tran for such expenses. During fiscal year 1972 he submitted vouchers covering $9,869.90. During fiscal year 1973 he submitted vouchers covering $7,569.14 and charged back $2,050.

During the calendar years 1971, 1972, and 1973 Huffaker received advances for travel and entertainment expenses and submitted vouchers for travel and entertainment expenses as follows:

| *Year* | *Advances* | *Vouchers* | *Difference* |
|---|---|---|---|
| 1971 ....... | $6,900 | $4,305.55 | $2,594.45 |
| 1972 ....... | 19,250 | 9,028.00 | 10,222.00 |
| 1973 ....... | 20,500 | 7,724.67 | 12,775.33 |
|  |  |  | 25,591.78 |

Respondent determined that the following amounts Huffaker received from Ma-Tran during these years constituted dividend income:

|  | *1971* | *1972* | *1973* |
|---|---|---|---|
| Meals[2] ................................................... | $868.70 | $801.00 | $1,098.84 |
| Entertainment ............................................. | 35.91 | 243.84 | 0 |
| Travel advances in excess of vouchers .............. | 2,594.45 | [3]8,172.00 | 12,775.33 |
| Totals ................................................. | 3,499.06 | 9,216.84 | 13,874.17 |

During the calendar years 1971, 1972, and 1973 House received

---

[2] The term "meals" is the characterization used in respondent's notice of deficiency. The total for 1973 includes some items other than meals, e.g., lodging, clothes, and office equipment.

[3] $10,222 advanced less $2,050 chargeback.

the following amounts from Ma-Tran which respondent has determined constituted dividends to him:

|  | 1971 | 1972 | 1973 |
|---|---|---|---|
| Meals | $279.60 | $853.21 | 0 |
| Entertainment and automobile | 26.55 | 16.75 | 0 |
|  | 306.15 | 869.96 | 0 |

Respondent's agent began his examination of petitioner's taxable years in question in September of 1973. On October 22, 1973, the board of directors of Ma-Tran, Huffaker, House, and Carrie Lou Huffaker, held a special meeting at which it was—

RESOLVED, that should the Internal Revenue Service at any time contend or determine that the salary or travel expenses of any officer of this corporation, either heretofore or hereafter paid or incurred, are excessive, and are disallowed in any amount, such officers so affected shall be required to immediately make necessary refund, or restitution of such amount to this corporation.

On October 2, 1974, Huffaker caused a check in the amount of $21,778.30 and payable to Ma-Tran to be issued. The check was intended as an accounting for the advances he received in excess of his expenses.

For fiscal years 1968 through 1973 Ma-Tran had gross sales and net profits[4] as follows:

| Year | Gross sales | Net profit |
|---|---|---|
| 1968 | $165,879.87 | $6,894.25 |
| 1969 | 194,952.83 | 9,916.99 |
| 1970 | 666,458.27 | 69,218.79 |
| 1971 | 638,199.29 | 22,542.41 |
| 1972 | 664,573.67 | 20,503.98 |
| 1973 | 670,244.20 | 9,608.08 |

It paid salaries to Huffaker and House as follows:

| Year | Huffaker | House |
|---|---|---|
| 1968 | $2,100.00 | $2,100.00 |
| 1969 | 8,550.00 | 9,100.00 |
| 1970 | 14,325.00 | 8,925.00 |

---

[4]Before adjustment for any audit changes during the years in question.

| 1971 | 32,967.03 | 24,692.04 |
| 1972 | 36,167.03 | 24,182.97 |
| 1973 | 32,595.30 | 24,795.30 |

It paid dividends totaling $520 to minority shareholders in both its fiscal years 1972 and 1973.

Ma-Tran's corporate income tax returns for fiscal years 1972 and 1973 were prepared by William Gryder, a certified public accountant. Gryder also prepared the individual returns of Huffaker and House for their calendar years 1971, 1972, and 1973. He was Ma-Tran's accountant both for the corporation and for the profit-sharing trust.

OPINION

*Issues 1 and 2. Qualification of Profit-Sharing Trust*

To be deductible contributions paid by an employer pursuant to a profit-sharing plan must be made to a trust exempt under section 501(a). Sec. 404(a)(3). Section 501(a) exempts from income taxation trusts which satisfy the section 401(a) qualification requirements. Thus, Ma-Tran's contributions to the profit-sharing trust are deductible only if the profit-sharing trust was qualified for the years in issue.

Section 401(a) provides:

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a * * * profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section.

In determining whether a trust is qualified under section 401(a) we must consider both the terms of the trust and its operation. *Quality Brands, Inc. v. Commissioner,* 67 T.C. 167, 174 (1976). There is no question that the plan was qualified on its face. The original plan was amended pursuant to suggestions of the Internal Revenue Service which subsequently issued a favorable determination letter. Respondent revoked the qualified status of the trust, and hence its exemption, based on his determination that the administration of the plan was deficient.

In particular, respondent contends that the transactions entered into were inconsistent with the section 401(a) requirement that the trust be operated "for the exclusive benefit of [the] employees or their beneficiaries." We agree with respondent.

We have previously found that the exclusive benefit rule precludes the diversion of trust assets for the benefit of the majority shareholder.[5] *Feroleto Steel Co. v. Commissioner,* 69 T.C. 97, 113 (1977). Two of the factors considered therein were the lack of adequate security and the low interest rate charged.

For fiscal years 1971 through 1973 the trust received total contributions of $55,807.83 as follows:

| Date | For fiscal year | Amount |
|---|---|---|
| ............................ | 1971 | $18,383.44 |
| 9/15/72 ................. | 1972 | 18,429.66 |
| 9/15/73 ................. | 1973 | 18,994.73 |
| | | 55,807.83 |

Those funds were invested as follows:

| Date | Amount | Debtor | Rate | Security |
|---|---|---|---|---|
| 2/7/72 | $2,000.00 | Dillon | 10 | none |
| 5/8/72 | 5,000.00 | Huffaker | 6 | none |
| 9/8/72 | 5,000.00 | Ma-Tran | 6 | none |
| 9/15/72 | 18,378.66 | Ma-Tran | 6 | none |
| 9/22/72 | 10,000.00 | Ma-Tran | 6 | none |
| 2/16 73 | 7,000.00 | Ma-Tran | 6 | none |
| | 47,378.66 | | | |

Although all the loans were due in 1 year, up to time of trial only one note had been renewed. At that time all loans were currently delinquent, no interest had been paid thereon, and a mere $10,802.62 had been repaid ($10,552.62 by Ma-Tran and $350 by Dillon). In sum, of the $55,807.83 contributed to the trust, only $19,331.79 is presently in the fund. Neither were the retained funds profitably invested. The trust had no gross income for the years in issue. The persons who benefited by the use of the funds were Dillon to the extent of $2,000, Huffaker (a trustee of the trust) to the extent of $5,000, and Ma-Tran (the creator of the trust) to the extent of $48,807.83.

Ma-Tran argues that we should follow *Time Oil Co. v. Commissioner,* 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956). Therein the employer did not make cash contributions to the trust as they were due, but issued to the trustees

---

[5]Other than benefits which result as "an incidental side effect of an investment of trust assets."

non-interest-bearing demand notes. The employer later issued cumulative preferred stock backdated to the dates of the notes. The Ninth Circuit found that the benefit accruing to the employer through the above transactions did not exceed the benefit existing under the plan. It also found that this approach was not detrimental to the employees. The trustees in *Time Oil* had neglected to keep books and records for the first 2 years of the plan. Thus, they were unaware of distributions which, according to the plan, should have been made to terminated employees. Two years after the implementation of the plan the administration of the trust was brought up-to-date. The trustees began making the necessary distributions 60 days prior to the hearing date. The Ninth Circuit found that "no gain to the employer or loss or prejudice to the employee"[6] resulted from the inept administration of the trust.

Aside from the loan transactions, three administrative deviations from the prescriptions of the plan occurred herein during the years in issue: First, by the terms of the plan if a participant dies while in the employ of Ma-Tran, his full interest vests immediately and becomes payable to the designated beneficiary or, if none, to the surviving spouse. On August 13, 1971, a plan participant died while employed by Ma-Tran. No mention of a designated beneficiary is made on the record, but the decedent's spouse survived him. No allocation of funds was made to his account for fiscal year 1972. No disbursement of his interest has been made.

Second, by the terms of the plan a participant's interest is vested to the extent of 10 percent at the time he first becomes eligible to participate; an additional 10 percent vests at the end of each full year of participation. If he terminates employment at Ma-Tran prior to age 65 his vested interest is to be set aside until he reaches age 65, unless he becomes totally disabled or dies prior to that date. During the years in issue seven participants terminated their employment. By definition all had at least a 10-percent vested interest. However, the trustees treated the entire balance in these accounts as forfeitures and allocated the account balances to other participants.

Third, by terms of the plan that percentage of the total

---

[6]*Time Oil Co. v. Commissioner*, 258 F.2d 237, 239 (9th Cir. 1958).

forfeitures which is equivalent to the total compensation paid to that participant over the total compensation paid to all participants during that year should be allocated to each participant's account. The forfeitures were allocated to other participants' accounts on ratios based on their account balances. This was the method of allocating forfeitures specified in the original plan. The Internal Revenue Service required an amendment correcting this allocation formula prior to the issuance of a favorable determination letter.

Unlike *Time Oil*, the deviations herein were not the result of administrative omission but the commission of specific administrative acts which are antithetical to the dictates of the plan. We have previously held that the manner of reallocating forfeitures may result in disqualification of a trust. *Quality Brands, Inc. v. Commissioner, supra* at 175.

Finally, in *Time Oil* the taxpayer voluntarily rectified the administrative deviation without assurance that such compliance with the plan provisions would result in a favorable determination with regard to the plan's qualification. *Ludden v. Commissioner*, 68 T.C. 826, 832 (1977). Herein House responded to questioning at trial as follows:

Q. In other words, you only have that intention if you get a qualified plan within—with—as determined by the Internal Revenue Service or by the Court?

A. Well, now, I don't follow that exactly.

Q. In other words, your intention to go on with the—with the plan for the—for the alleged benefit of the employees is—is continued on its—or is conditioned on this qualification?

A. It's—well, we have to know we have a plan or don't have a plan. That's what I'm saying, if that's—if that's what you mean.

It is obvious that the trustees considered the plan to exist only if it was found to be qualified.

In some respects this is a difficult issue because we do not believe that petitioner deliberately failed to observe the requirements of an exempt plan or that it consciously tried to abuse the trust's tax-exempt status. Nevertheless there are a series of areas where, no matter how innocent, technicalities were not met. Each failure may be sufficient on its own to disqualify the plan and the cumulative effect of these failures is devastating, tax-wise, to the trust's continued exempt status.

For these reasons we find that the plan was not operated for the exclusive benefit of the employees or their beneficiaries.

Failing to satisfy the exclusive benefit rule the trust fails to be qualified under section 401(a) and, domino fashion, fails to satisfy the requirements to section 501(a) tax exemption. Therefore, the contributions paid to the trust are not deductible. Sec. 404(a)(3).

### Issue 3. Rental Payments

Ma-Tran objects to the application of section 274 to its payment of rent for an apartment it asserts was exclusively used by business customers. In doing so it distinguishes provision of a hotel suite to a business customer and Ma-Tran's provision of an apartment instead of a hotel suite to those same individuals. Ma-Tran bases its distinction on the idea that "the furnishing of an apartment to business associates is not an activity which would be generally regarded as constituting entertainment." This is a distinction without a difference.

Section 274[7] requires substantiation of certain items claimed as section 162 expense. The taxpayer may provide substantiation "by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the * * * use of the facility, * * * (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift." Sec. 274(d). Herein Ma-Tran kept no records of the use of the apartment. Neither did it present corroborating evidence. Instead it asserts that because the apartment was exclusively used as lodging for business customers documentation would be superfluous.

It is a factual question whether an item is an ordinary and necessary business expense. The burden of proving that

---

[7]SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(a) ENTERTAINMENT, AMUSEMENT, OR RECREATION.—

(1) IN GENERAL.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) ACTIVITY.—With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to * * * the active conduct of the taxpayer's trade or business, or

(B) FACILITY.—With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business,

and such deduction shall in no event exceed the portion of such item directly related to * * * the active conduct of the taxpayer's trade or business.

respondent's determination is erroneous rests on petitioner. *Welch v. Helvering,* 290 U.S. 111, 115 (1933). Herein there is inadequate proof both that business associates actually made significant use of the apartment and that a direct connection existed between such use and Ma-Tran's business. *Sutter v. Commissioner,* 21 T.C. 170, 173 (1953).

## Issue 4. Meals Consumed Locally

Ma-Tran deducted the cost of meals incurred by Huffaker and House while in the Knoxville area. Ma-Tran contends that because the meals were consumed while Huffaker and House were on company business their cost should be deductible. We do not agree.

Section 161 provides that specified deductions will be allowed subject to the exceptions. Section 162 provides that ordinary and necessary business expenses are deductible. However, under the auspices of section 161, section 262 excludes therefrom personal, living, and family expenses except as expressly provided. Section 162 expressly provides that the personal expenses incurred for meals and lodging while away from home on company business are deductible.

It is stipulated that the cost of the meals was incurred in the Knoxville area. In the absence of factual circumstances which could trigger the away from home exception, the meals clearly constitute nondeductible personal expenses. Cf. *Commissioner v. Kowalski,* 434 U.S. 77 (1977). No attempt has been made by Ma-Tran to comply with the section 274 substantiation requirements. We find the cost of meals consumed by Huffaker and House in the Knoxville area to be nondeductible personal expenses.

## Issue 5. Travel Expenses in Excess of Vouchers

For its taxable years 1972 and 1973 Ma-Tran made advances to Huffaker in excess of vouchers he submitted. Again, Ma-Tran has the burden of proving the error in respondent's determination. *Welch v. Helvering, supra.* In the absence of vouchers or other evidence delineating the nexus between the excess advances and Ma-Tran's business we cannot find such amounts to be ordinary and necessary.

### Issues 6 and 7. Dividends to Huffaker and House

Respondent has determined that Ma-Tran's expenditure of corporate funds for meals, entertainment, automobile, apartment, and travel expenses in excess of vouchers constitutes dividends to the shareholders on whose behalf they were paid. Respondent bases his determination on *Challenge Mfg. Co. v. Commissioner*, 37 T.C. 650 (1962), wherein we found that corporate expenditures and corporate facilities which personally benefited shareholders constituted dividends to them in an amount equal to the fair market value of such benefits.

Huffaker and House have conceded the amounts listed under entertainment and automobile expenses. Respondent has conceded that amounts totaling $569.04[8] he had included as "meals" for 1973 are not dividends to Huffaker in that year.

With respect to Huffaker, respondent included three items under the heading "meals" that were of a nonedible nature.[9] Although he takes issue with respondent's determination that these amounts were expended for nonbusiness reasons, Huffaker does not connect the expenditure for two of these items with a business purpose. The third item is winter clothing purchased for his use in Idaho. We have no evidence before us that these articles of clothing were distinguishable from clothing ordinarily worn in such climate.

The remaining meals were those, previously discussed, which Huffaker and House consumed within the Knoxville area. We have found these meals to be expenses personal to them and, therefore, not deductible by Ma-Tran as an ordinary and necessary business expense. So, too, do we find these expenditures personal to them for dividend purposes. *Mohr v. Commissioner*, 45 T.C. 600, 614 (1966).

---

[8]

| Expenditure | Amount |
|---|---|
| Royal Orleans | $231.13 |
| The Orangery | 93.16 |
| Miller's | 104.95 |
| Franklin Optical | 33.80 |
| Lowenstein Bros | 106.00 |
| | 569.04 |

[9]

$39.95 to Lowenstein Bros.
$16.25 to Maxey's Boat Dock for gas.
$83.44 to Hub Clothiers for winter clothing.

Ma-Tran advanced moneys to Huffaker to cover travel expenses. However, the advances exceeded the amounts of the travel vouchers he submitted. After respondent's audit was initiated, Ma-Tran's board of directors passed a resolution to the effect that if the Internal Revenue Service determined travel expenses to be excessive they must be repaid. One year later Huffaker repaid a substantial portion of the excess. However, at the time of the advances Huffaker had an unrestricted right to the excess amounts. They therefore constitute a corporate distribution. *Mohr v. Commissioner, supra.*

The apartment was originally leased by House. He resided at the apartment from January until April of 1971 and returned in November of 1973. During the interim he stored his out-of-season clothes in one of the closets. Ma-Tran paid the rent for the entire period. It is obvious that House made significant use of the apartment in both 1971 and 1973.

In 1972 House did not reside in the apartment. He did, however, make use of one closet. Ma-Tran did not distinguish between the periods in which House was or was not in residence with regard to its payment of the rent. From the totality of the circumstances we find that the apartment was available for House's use in 1972.

Because Ma-Tran made expenditures which personally benefited its shareholders, Huffaker and House, we find that the amounts expended by Ma-Tran for meals, entertainment, automobile, apartment, and travel expenses in excess of vouchers constitute dividend income to Huffaker and House. *Challenge Mfg. Co. v. Commissioner, supra* at 663. In so doing we note that the minority shareholders had otherwise received dividends in Ma-Tran's fiscal years 1972 and 1973.

## Issue 8. Additions to Tax

Respondent determined that Ma-Tran owes an addition to tax under section 6653(a) for its fiscal years 1972 and 1973. Section 6653(a) provides that an addition to tax in the amount of 5 percent of the underpayment will accrue "If any part of any underpayment * * * is due to negligence of intentional disregard of rules and regulations."

Ma-Tran contends that its employment and reliance on a certified public accountant was reasonable and absolves it from liability under section 6653(a). We cannot agree.

The burden is on the taxpayer to prove that respondent's determination is incorrect. *Enoch v. Commissioner*, 57 T.C. 781, 802 (1972). As in *Enoch*, Ma-Tran's sole justification is reliance on a certified public accountant. No evidence was presented to show the Court that he supplied the accountant with the correct information or that the filing of the incorrect returns was the result of the accountant's error. Neither can Ma-Tran absolve itself from its duty to file correct returns merely by alleging reliance on a certified public accountant with regard to nonsophisticated issues. Ma-Tran has failed to carry its burden.

*Decisions will be entered under Rule 155.*